AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

| LODGED<br>CLERK, U.S. DISTRICT COURT<br>9/17/25<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___MRV___ DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

| FILED<br>CLERK, U.S. DISTRICT COURT<br>09/17/2025<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___GR___ DEPUTY |

United States of America

v.

ISRRA MOHAMADEH AYYAD,

Defendant

Case No.  2:25-mj-05769-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 15, 2025 in the county of Los Angeles in the Central District of California, the defendant violated:

*Code Section*

21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)

*Offense Description*

Possession with Intent to Distribute 50 grams or more of Methamphetamine

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Complainant's signature*

MICHAEL CHOI, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    September 17, 2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA: Blake Hannah X0172

**ATTACHMENT A**

I.  **PROPERTY TO BE SEARCHED**

The following digital devices (the "SUBJECT DEVICES"), seized during the arrest of Isrra Mohamadeh Ayyad on or about September 16, 2025, and held in the custody of Homeland Security Investigations, in El Segundo, California: a silver Apple iPhone 15 ProMax bearing IMEI number 356371486689922 ("SUBJECT DEVICE 1"), and a white Apple iPhone bearing IMEI number 0450545045450 ("SUBJECT DEVICE 2").

**ATTACHMENT B**

I. **ITEMS TO BE SEIZED**

    1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), namely:

    a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

    b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

    c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

    d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of

drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

   e. Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the above-described offenses;

   f. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

  2. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

  3. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

   a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

   b. of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the attachment of other devices;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    e. evidence of the times the device was used;

    f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

    g. records of or information about Internet Protocol addresses used by the device.

  4. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICES

  5. In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.  The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.  The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed one year from the date of issuance of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this one-year period without obtaining an extension of time order from the Court.

d.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK"

(Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

  e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

  f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

  g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

  h. If the search determines that a SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

  i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

    j.  After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Michael Choi, being duly sworn, declare and state as follows:

I.

II. **PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of a criminal complaint against Isrra Mohamadeh Ayyad ("AYYAD") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (the "SUBJECT DEVICES"), seized during the arrest of AYYAD on September 16, 2025, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in Attachment A:

   a. One silver iPhone 15 ProMax, IMEI: 356371486689922, seized from AYYAD's person ("SUBJECT DEVICE 1"); and

   b. One light blue iPhone 14 Plus, IMEI: 355348896487406, seized from AYYAD's person ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are

incorporated herein by reference. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. BACKGROUND OF AFFIANT

4. I am a Special Agent ("SA") with HSI and have been since March 2020. I am currently assigned to the office of the Assistant Special Agent in Charge Los Angeles International Airport ("LAX"). My formal education consists of a bachelor's degree from Columbia University. From May 2021 to September 2021, I attended the HSI Special Agent Academy, a criminal investigations academy conducted at the Federal Law Enforcement Training Center located in Brunswick, Georgia. During these programs, I received training in HSI's criminal investigative and arrest authority, as well as investigative techniques for conducting criminal investigations, including special training in investigations regarding narcotics.

5. At the HSI Academy, I was trained in all aspects of conducting criminal investigations and received several hundred hours of comprehensive, formalized instruction for investigating

violations of customs and immigration law, to include offenses involving drug trafficking, computer crimes, and conspiracy.

## IV. SUMMARY OF PROBABLE CAUSE

6. Between the late hours of September 15, 2025, and early morning hours of September 16, 2025, Israa Mohamadeh AYYAD attempted to travel from LAX to Tokyo Haneda Airport via American Airlines flight 169, which was scheduled to depart at approximately 1:15 a.m.

7. LAX Customs and Border Protection ("CBP") officers conducted an inspection of AYYAD's checked luggage. During inspection, CBP officers identified six vacuum sealed bags with a white crystalline substance that later field-tested positive for methamphetamine and weighed a total of approximately 16.54 kilograms.

## V. STATEMENT OF PROBABLE CAUSE

8. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I know the following facts:

### A. AYYAD Attempted to Smuggle Methamphetamine Inside of Her Checked Bag on September 15, 2025

9. I know from talking with CBP Officer Jonathan Huynh, AYYAD had checked in a blue suitcase with American Airlines ("AA") prior to her flight on AA 169 from LAX to Tokyo Haneda Airport scheduled to depart at approximately 1:15 a.m. on September 16, 2025.

10. CBP conducted an inspection of AYYAD's luggage. Upon opening the suitcase, CBP observed a layer of clothes and below were six vacuum sealed bags containing a white crystalline substance, pictured below:




11. At approximately 12:30 a.m., CBP made contact with AYYAD as she was attempting to board her flight at Gate 153. AYYAD stated to the CBP Officer that the suitcase in question belonged to her and she assumed ownership for all contents inside the bags.

12. Based on my knowledge of the investigation, I know that at approximately 12:30 a.m., CBP informed HSI that AYYAD was offloaded from her flight due to a suspicious white crystalline substance being discovered inside her checked-in bag. At approximately 2:45 a.m. on September 16, 2025, HSI took AYYAD into custody – at that time AYYAD was in possession of the SUBJECT DEVICES.

4

13. CBP performed a field-test on the white crystalline substance, using a Gemini device, and the substance tested positive for the presence of methamphetamine. The total approximate weight of the methamphetamine that AYYAD had in her checked-in bag was approximately 16.54 kilograms. Based on my training and experience, the quantity of methamphetamine is consistent with distribution, not mere personal use.

**B.  Interview of AYYAD**

24. At approximately 2:15 a.m. on September 16, 2025, CBP Officer Sergio Rivas and I interviewed AYYAD. The following is a summary of the interview and does not purport to set forth all facts or knowledge involved in the interview.

25. AYYAD was presented a Miranda Rights Waiver form. AYYAD waived her rights and began to speak with HSI regarding the methamphetamine located in her checked-in luggage. AYYAD gave consent for HSI to review both SUBJECT DEVICES and voluntarily provided the passcodes.

26. AYYAD told law enforcement that she was approached by an unidentified male ("UM1") in Atlanta, GA about "making some money." AYYAD stated UM1 made all the arrangements for her travel to include housing and airline ticket. AYYAD was told a suitcase would get dropped off to her at the hotel and she would get paid for transporting the suitcase to Japan – AYYAD was not aware of the amount she would receive upon delivery and was told she would receive compensation upon arrival in Japan.

27. On or about September 15, 2025, at approximately 11:20 p.m., AYYAD was picked up by a separate unidentified male

5

("UM2") in a white Mercedes in front of Renaissance Los Angeles Airport Hotel located at 9620 Airport Blvd., Los Angeles, CA 90045. UM2 handed AYYAD a blue suitcase and dropped her off at Tom Bradley International Terminal at LAX.

28. Based on my knowledge of the investigation, HSI took custody of the methamphetamine, luggage, and SUBJECT DEVICES.

## VI. TRAINING AND EXPERIENCE ON DRUG OFFENSES

29. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications,

sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes the SUBJECT DEVICES.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

7

been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the

8

device was being controlled remotely by such software.

        d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    33. Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VIII. CONCLUSION

34. For all the reasons described above, there is probable cause to believe that AYYAD has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Possession with Intent to Distribute Methamphetamine. There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
MICHAEL CHOI, Special Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 17th day of September,
2025.

*Karen L. Stevenson*
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE